**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
TWEED-NEW HAVEN AIRPORT        :
AUTHORITY,                     :
                               :
    Plaintiff,                 :
                               :
v.                             : CASE NO. 3:15cv01731 (RAR)
                               :
GEORGE JEPSEN, IN HIS          :
OFFICIAL CAPACITY AS ATTORNEY  :
GENERAL FOR THE STATE OF       :
CONNECTICUT                    :
                               :
    Defendant.                 :
```

**MEMORANDUM OF DECISION**

Plaintiff, Tweed-New Haven Airport Authority (hereinafter "Plaintiff" or "the Authority"), brings this suit against George Jepsen in his official capacity as Attorney General for the State of Connecticut ("Defendant"), seeking declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201 *et seq.* (Dkt. # 1). Plaintiff alleges that Conn. Gen. Stat. 15-120j(c) violates the Supremacy Clause of the United States Constitution.

For the reasons set forth below, the Court finds that the plaintiff lacks standing to bring this action and that Conn. Gen. Stat. 15-120j(c) is not preempted by the Supremacy Clause.

## PROCEDURAL BACKGROUND

Plaintiff filed this action on November 24, 2014 in federal court.  (Dkt. # 1).  On June 30, 2016, the defendant filed a Motion to Dismiss.  (Dkt. # 39).  On August 8, 2016, plaintiff filed a memorandum in opposition to defendant's motion to dismiss.  (Dkt. # 44).  On August 22, 2016, the defendant filed a reply memorandum in support of its motion to dismiss.  (Dkt. # 45).  On September 29, 2017, the Court held oral argument on the motion to dismiss.  (Dkt. # 49).  On December 9, 2016, the undersigned denied the motion to dismiss.  (Dkt. # 53).

A bench trial was held on March 22, 2017 before the undersigned.  (Dkt. # 67).  On May 19, 2017, the parties submitted simultaneous post-trial briefs.  (Dkt. #'s 73-74).  On July 19, 2017, at the request of the parties, oral argument was held on the post-trial briefs.  (Dkt. # 77).

## FACTUAL BACKGROUND

The following facts, drawn from the parties' Stipulation of facts in their Joint Trial Memorandum, are undisputed.  (Dkt. # 59, Stipulation of Facts).[1]

Tweed-New Haven Airport Authority is a public instrumentality and political subdivision of the state of Connecticut, pursuant to Conn. Gen. Stat. 15-120i, et seq.

---

[1] The stipulated facts are hereafter referred to as "Stip. #."

(Stip. # 2).  The airport property is owned by the City of New Haven and leased to the Authority pursuant to the terms of a Lease and Operating Agreement, dated July 1, 1998.  (Stip. # 7).

The length of Runway 2/20 is currently approximately 5,600 linear feet.  (Stip. # 9).  In 2009, the state of Connecticut, through Public Act 09-7, amended Conn. Gen. Stat. §15-120j by adding subsection (c) which provides, in relevant part: "Runway 2/20 of the airport shall not exceed the existing paved runway length of five thousand six hundred linear feet."  (Stip. # 9).

The Airport is among the public-use airports included in the National Plan of Integrated Airport Systems.  (Stip. # 10).  The Airport consists of numerous structures, including an airport terminal building and an air-rescue and fire-safety facility, Runway 2/20, which runs essentially North/South on the site, crosswind Runway 14/31, which runs Northwest/Southeast, and a number of taxiways.  (Stip. # 12).  All of these structures are within the Airport's boundaries and are part of the Airport Layout Plan ("ALP").  (Stip # 13).  The ALP is approved by the FAA, which maintains full control over any modifications to the ALP, including limitations on runway length.  (Stip. # 13).

The Airport is classified by the United States Department of Transportation Federal Aviation Administration ("FAA") as a primary, commercial service airport in that it provides

regularly scheduled commercial passenger air service.  (Stip. #
14).  As a result of this classification, the Airport is
currently required to, and does, hold an operating certificate
under FAA regulation part 139 (14 C.F.R. Part 139), which
currently requires the Airport to have runway safety areas on
its main runway that are acceptable to the FAA.  (Stip. # 14).

Part 139 establishes the rules governing the certification
and operation of airports serving scheduled passenger-carrying
operations of an air carrier operating aircraft configured for
more than 9 passenger seats.  (Stip. # 15).  The Airport is
required under Part 139 to operate and maintain the Airport
according to standards contained in the FAA Advisory Circulars.
(Stip. # 15).  Additionally, as a recipient of federal aid under
the FAA Airport Improvement Program ("AIP'), the Airport is
required to comply with AIP grant assurances.  (Stip. # 15).

The FAA requires a master plan that outlines future plans
for upgrading airport facilities for each Part 139 airport.
(Stip. # 16).  The Airport's updated master plan for the
Airport, which included extending the length of Runway 2/20 up
to 7,200 linear feet, was approved by the state and by the FAA
in 2002.  (Stip. # 16).

There is one commercial airline providing service to the
Airport from Philadelphia, with four scheduled flights per day
in each direction and a capacity of no more than 37 passengers

4

on each flight.  (Stip. # 17).  The length of the runway has a direct bearing on the weight load and passenger capacity that can be safely handled on any given flight.  (Stip. # 17).

Since 2009, the Airport has failed to attract a single new scheduled commercial carrier, and service remains low, with fewer than 35,000 emplanements per year.  (Stip. # 18).  Weight penalties are imposed on aircraft for safety reasons, and a longer runway could potentially reduce or eliminate the weight penalties that are imposed on existing flights at the Airport. (Stip. # 19).  Current scheduled commercial service at the Airport is entirely provided by a single type of aircraft, the Bombardier DH8-100 (the "Dash 8").  (Stip. # 20).

Runway 2/20, because of its length, does not allow the Dash 8 to takeoff at maximum capacity.  (Stip. # 21).  The Dash 8 has capacity for 37 passengers, but generally only 33 passengers are allowed on the plane.  (Stip. # 6).  Lengthening Runway 2/20 would allow the Dash 8 and other larger aircrafts to potentially service the Airport, hold more passengers and service additional destinations.  (Stip. # 22).

The Airport has commenced planning on a runway extension project to increase the functioning length of Runway 2/20, within the existing boundaries of the Airport and the ALP, on land that is currently part of the runway safety areas.  (Stip. # 23).  The planning documents describe several alternatives for

lengthening Runway 2/20 up to 6,601 linear feet and modifying related taxiways.  (Stip. # 23).  The initial step in the Project is to perform an Environmental Assessment of the various layout and construction options.  (Stip. # 23).  The Authority has expended private funds to hire Hoyle, Tanner & Associates, Inc. ("Hoyle"), a consulting engineering firm, which has conducted a preliminary environmental assessment.  (Stip. # 23).

Robert M. Furey is Senior Vice President at Hoyle, which is located in Manchester, NH.  (Stip. # 25).  Hoyle specializes in airport planning, design and construction administration and has performed engineering work for the Authority since 1999.  (Stip. # 27).  Mr. Furey has personal knowledge regarding the Preliminary Environmental Assessment at the Airport and the environmental assessment process.  (Stip. # 26). Federal review and comment is necessary for any construction project located within the ALP, and one of the initial steps in any such project under the applicable federal regulations is to submit an Environmental Assessment to the FAA.  (Stip. # 28).

Hoyle looked at a number of alternatives for lengthening Runway 2/20 ranging from 6,601 linear feet up to 7,000 linear feet.  (Stip. # 29).  The Authority proposes to pave a portion of the Runway 2/20 runway safety areas and this paved section would be considered a runway extension.  (Stip. # 24).

In 2014, Hoyle completed the first three chapters of an Environmental Assessment, as the customary procedure is to submit a Preliminary Environmental Assessment to the FAA for review and comment before drafting the full Environmental Assessment. (Stip. #'s 30-31). The ultimate document that the Authority submitted to the FAA for review included only runway alternatives that were not longer than 6,601 linear feet. (Stip. # 29).

The FAA has declined to review and comment on the content of the Preliminary Environmental Assessment for more than two years. (Stip. # 32). The FAA has not provided funding to the Project and has not reviewed the alternative layouts presented in the Preliminary Environmental Assessment. (Stip. # 32). FAA review of the Preliminary Environmental Assessment is a necessary step in the Environmental Assessment process. (Stip. # 33).

The FAA is not proceeding with review of the Environmental Assessment in part because the Authority is in violation of several federal grant assurances and regulations. (Stip. # 34). The FAA's decision not to respond to the Authority's request for review of the Preliminary Environmental Assessment is in part because of the runway length limitation in Connecticut General Statutes §15-120j(c). (Stip. # 35).

Whenever the Authority accepts federal funds, it agrees to various grant assurances which, among other things, require compliance with a long list of federal statutes and regulations directed to airport facilities and operations.  (Stip. # 36). Non-compliance by an airport such as Tweed can result in enforcement action by the FAA.  (Stip. # 36).

FAA Advisory Circular 150/5300-13A, Airport Design, establishes criteria for the separation of runways and parallel taxiways.  (Stip. # 37).  The runway to taxiway separation distance is a function of the Airport Reference Code.  (Stip. # 37).  The ALP approved by the FAA for the Airport identifies the primary runway, Runway 2/20, as a C-III runway.  (Stip. # 37). The designation C-III includes aircraft with approach speeds of 121 knots or more but less than 141 knots, and wingspans greater than 79 feet but less than 118 feet.  (Stip. # 37).

The interactive runway design standard matrix (Table 3-5) in FAA Advisory Circular 150/5300-13A specifies that the runway centerline to parallel taxiway centerline for C-III aircraft is 400 feet.  (Stip. # 38).  The current locations and dimensions of taxiways, which are integral to the aircraft landing and takeoff system, are not in compliance with federal regulations in terms of their distance from Runway 2/20.  (Stip. # 39). This non-standard separation between the taxiway and the runway

could be brought into compliance as part of the proposed runway extension project.  (Stip. # 39).

Hoyle prepared drawings depicting improvements to Taxiways A, F and G at the Airport.  (Stip. # 40).  The primary safety improvement alternative is to extend the runway with a taxiway centerline separation to the required distance of 400 feet, in accordance with FAA Advisory Circular 150/5300-13A, Table 5. (Stip. # 40).  This would provide the Airport and FAA with safer runway and taxiway ground  maneuvering as well as greater separation between active takeoff and landing operations and aircraft which are either holding short or maneuvering adjacent to the runway.  (Stip. # 40).

The alternatives identified in the Preliminary Environmental Assessment include the extension of the parallel taxiway.  (Stip. # 41).  A full length parallel taxiway is required for runways with instrument approach procedures with visibility minimums below one mile. (Stip. # 41).  The existing Runway 2/20 instrument landing system approach has visibility minimums of ¾ mile. (Stip. # 41).  Construction of the parallel taxiway at the standard 400 foot runway centerline to taxiway separation would bring the airport into compliance with FAA standards.  (Stip. # 41).

Although there is no enforcement action pending by the FAA against the Authority due to the non-standard separation between

the taxiway and the runway, the FAA has issued notice to the
Authority that the Authority is not in compliance with all of
the requirements of CV.F.R/ part 139, the Airport Certification
Manual and the Airport Operating Certificate.  (Stip. # 42).
The FAA expects the Authority to achieve the standard 400 foot
separation between Taxiway A and Runway 2/20 and the 400 foot
separation has been included in the Preliminary Environmental
Assessment.  (Stip. # 42).

The Authority is not in compliance with FAA design
standards due to the non-standard taxiway geometry.  (Stip. #
43).  The FAA has given the Authority until May 6, 2021 to
redesign and reconstruct its taxiways, including realignment of
Taxiway A, to bring the Airport into compliance with federal
design standards.  (Stip. # 43).  There is no current or pending
FAA enforcement action against the authority for noncompliance
with any FAA safety standard applicable to 49 U.S.C. Part 139
airports or any standard contained in FAA Advisory Circular
150/5300-13A.  (Stip. # 44).

Tom Reich, the Director of Air Service Development at AFCO
AvPorts Management, LLC, has provided marketing services to the
Tweed-New Haven Airport and for other airports around the
country. (Stip. # 45).  He was previously employed as a market
analyst for Independent Air and as the Manager of Market
Planning for Colgan Air's United Express and US Airways Express

branded operations.  (Stip. # 45).  Mr. Reich has provided marketing services for the Airport since December 2011.  (Stip. # 46).  During the time that he has provided marketing services to the Airport, Mr. Reich has been in touch with approximately ten different airlines with regard to the possibility of those airlines bringing service to the airport.  (Stip. # 46).

From 2012 to 2016, Mr. Reich attended the Airports Council International—North America JumpStart Air Service Development Conference, where airlines and airport administrators convene annually.  (Stip. # 48).  Mr. Reich has met with numerous airline representatives at the JumpStart conferences with regard to the possibility of those airlines bringing service to the Airport, and has remained in steady contact with airline representatives throughout the years, even outside of JumpStart conferences.  (Stip. # 48).

In Mr. Reich's experience, there are three primary factors that determine whether or not an airline will choose to provide service to a given destination: (1) market size; (2) equipment performance; and (3) economic viability.  (Stip. # 49).  One analysis, completed by AvPort, shows that the South-Central Connecticut market is the largest catchment area in the United States in terms of existing passenger demand without nonstop flights to Orlando, Florida.  (Stip. # 50).

In Mr. Reich's experience, the overriding issue with respect to an airline choosing to provide service to a new destination is economic viability.  (Stip. # 51).  Runway length is an integral part of an airline's economic viability analysis due to the weight restrictions a shorter runway can cause and the resulting limit to the number of passengers that can be carried on the flight.  (Stip. # 51).  Lengthening a runway could eliminate safety concerns and could reduce the need for these weight restrictions at a given airport, allowing aircraft to carry more passengers while increasing the profit potential of the flight to an acceptable level for the airline.  (Stip. # 52)

In Mr. Reich's experience, weight restrictions can impose economic impediments at airports, such as Tweed, with short runways.  (Stip. # 53).  The Airport has the thirteenth shortest runway out of 348 airports where commercial service is provided, and according to the AvPorts analysis, the twelve airports with shorter runways do not have as large a catchment area as Tweed-New Haven Airport.  (Stip. # 53).  Tweed-New Haven Airport has the shortest runway in the nation for catchment areas with $1,000,000 or more people.  (Stip. # 53).

Allegiant Air has prepared this type of economic analysis for the Airport and has declined to service the Airport because "runway 2/20 is too short for Allegiant to comfortably operate

regularly scheduled commercial service." (Stip. # 55). Over his last five years providing marketing services to the Airport, Mr. Reich has been unable to convince any new airlines to commence service at Tweed. (Stip. # 57).

Over the past eight years the Authority has been operating the Airport at a loss which has required annual subsidies from the state of Connecticut in the amount of $1,500,000 and from the City of New Haven in the amount of $325,000. (Stip. # 58). The subsidy from the State was reduced to $1,480,000 for fiscal year 2016-2017. (Stip. # 58). Notwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory restriction on the length of Runway 2/20 is removed. (Stip. # 59).

In 2009, a Memorandum of Agreement ("MOA") was established among the City of New Haven, the Town of East Haven, the Authority and certain members of the General Assembly. (Stip. # 60). The MOA limits Runway 2/20 to the existing paved runway length of 5,600 feet. (Stip. # 61). It also limits daily commercial departures to thirty and annual emplanements to 180,000. (Stip. # 61).

Section III of the MOA references a bill for adoption in the 2009 Legislative Session that limited the length of the runway, increased the number of members of the Authority's Board

13

of Directors to be appointed by the Town of East Haven and City of New Haven related to the airport property.  (Stip. # 62), Section III also called for additional appropriations for the Authority in the two fiscal year budgets being considered in the 2009 Legislative Session that would have reduced the capital bond commitment of the State to the Airport.  (Stip. # 62)

The bill reducing the capital bond authorization was defeated and the restriction on the runway and the change in board membership in the designated bill were adopted, but the payment in lieu of taxes portion of the bill was not adopted and $1.5 million of additional appropriations were approved, whereas the MOA called for $2 million.  (Stip. # 62).  The items that were not adopted in the 2009 Legislative Session have not been adopted by subsequent General Assembly action.  (Stip. # 62).

Section IV of the MOA provides in pertinent part: "[T]his agreement may be terminated by written notice by either the City or the Town in the event  . . . (c) the State of Connecticut fails to enact the Legislative Initiatives contained in Section III of this Agreement in the 2009 Legislative Session."  (Stip. # 63).  To date, the City of New Haven has not taken steps to invalidate the MOA.  The Authority does not appear to have the power, pursuant to the MOA, to unilaterally terminate the MOA.  (Stip. # 64).

The Connecticut Coastal Management Act discourages the substantial expansion of existing airports within the coastal boundary.  (Stip. # 64).  Two permits from the Connecticut Department of Energy and Environmental Protection ("DEEP") were previously issued to the Authority for the construction of runway safety areas.  One of the permits, the tidal permit, states: "At no time shall the permittee modify the surfaces of the RSAs including paving."  The second permit, for disturbing wetlands and water quality, requires a modification to the permit from the DEEP if the safety areas are altered.  (Stip. # 66).

The FAA has indicated to the Authority that if it wishes to continue with its proposed runway extension project, the Authority must develop a joint action plan with DEEP addressing the Agency's concerns identified in the two previously issued permits.  (Stip. # 67).

If Conn. Gen. Stat. §15-120j(c) is removed or invalidated, the Authority intends to file an application seeking DEEP approval to remove the conditions in the permits mentioned above.  (Stip. # 68).  Increasing the length of Runway 2/20 would require the Authority to ensure that all new approach surfaces are clear for approaching aircraft.  (Stip. # 69).  The Authority is currently in the process of ensuring that such surfaces are clear for a 6,601 foot runway.  (Stip. # 69).  The

normal approval process for a runway extension requires: (a) careful planning, including review of feasible alternatives; (b) proper environmental analysis, consistent with federal regulations; and (c) sufficient funding, including federal, state and/or local sources.  (Stip. # 70).

The Airport Improvement Program ("AIP") provides about $3.5 billion annually versus an estimated need of over $40 billion over the next five years.  Accordingly, dollars must be allocated to the highest national priorities that are eligible and justified.  (Stip. # 71).  The Authority received approximately $24 million from the FAA in 2008 for its runway safety area project and has received over $40 million from the FAA in the past twenty years.  (Stip. # 72).

## DISCUSSION

### I.   Article III Standing

The defendant argues that the plaintiff has not sustained its burden of establishing the "injury in fact" necessary to confer standing, thereby depriving the Court of jurisdiction over this matter.  (Dkt. # 74 at 2).  Plaintiff argues, in response, that it has sustained multiple legally cognizable injuries, any one of which alone would satisfy the injury in fact requirement of standing.  (Dkt. # 73 at 6).

In the Court's ruling on the motion to dismiss, the undersigned found that the plaintiff's pleadings had satisfied the burden of establishing an injury in fact sufficient to confer standing.  However the standard of proof for establishing Article III standing is higher following a trial.  *See* Lujan v. Defs. of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137, 119 L. Ed. 2d 351 (1992)("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'")

Article III, § 2 of the United States Constitution restricts federal courts to deciding "'Cases' and 'Controversies.'"  Lujan, 504 U.S. at 559.  The "case-or-controversy requirement is satisfied only where a plaintiff has standing."  Sprint Comm'ns Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273 (2008).  "Three elements comprise the 'irreducible constitutional minimum' of standing: (1) the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable

decision." All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 228 (2d Cir. 2011), aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc., 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013).  "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan, 504 U.S. at 561.

Plaintiff first argues that the Airport is injured by virtue of the mere existence of Conn. Gen. Stat. §15-120j(c). (Dkt. # 73 at 6-8).  Specifically, plaintiff argues that the "statute's existence is sufficient to confer standing on Tweed because Tweed is currently injured by its inability to proceed with an FAA and state approved runway extension project."  (Dkt. # 73 at 7).  Plaintiff further contends that this "injury can be redressed by a decision declaring General Statutes §15-120j(c) unconstitutional.  (Dkt. # 73 at 7).

The defendant does not reply directly to plaintiff's argument.  However, the defendant describes several obstacles to lengthening Runway 2/20, apart from Conn. Gen. Stat. §15-120j(c).  The defendant notes that the normal approval process for a runway extension requires three things: "(a) careful planning, including review of feasible alternatives; (b) proper environmental analysis, consistent with federal regulations; and (c) sufficient funding, including federal, state and/or local sources."  (Dkt. # 74 at 22).

While the Authority had taken significant steps in planning the proposed runway, including hiring Hoyle, Tanner & Associates at its own expense to conduct a Preliminary Environmental Assessment, plaintiff faces serious hurdles to securing FAA approval as well as adequate funding.  (*See* Dkt. # 59, Stip. # 23).

Federal review and comment is necessary for any construction project located within the ALP.  (Dkt. # 59, Stip. # 28).  One of the initial steps under the applicable federal regulations in such a project is to submit an Environmental Assessment.  (Dkt. # 59, Stip. # 28).  The FAA has declined to review and comment on the content of the Authority's Preliminary Environmental Assessment for more than two years.  (Dkt. # 59, Stip. # 32).

The FAA is not proceeding with review of the Environmental Assessment for a variety of reasons, including because the Authority is in violation of several federal grant assurances and regulations.  (Dkt. # 59, Stip. # 34).  Additionally, two permits were previously issued by the DEEP for the construction of runway safety areas.  (Dkt. # 59. Stip. # 66).  The FAA has indicated to the Authority that if it wishes to continue with its proposed runway extension project, the Authority must develop a joint action plan with the DEEP addressing the agency's concerns identified in the two previously existing

19

permits.  (Dkt. # 59, Stip. # 67).  Thus, the existence of Conn.
Gen. Stat. §15-120j(c) represents one of several factors
preventing the FAA from reviewing the Preliminary Environmental
Assessment.

Additionally, projects utilizing federal funding must be
both eligible and justified at the time of the investment,
including runway extensions.  (Dkt. # 59, Stip. # 73).  The
Airport Improvement Program provides about $3.5 billion annually
versus an estimated need of over $40 billion over the next five
years.  (Dkt. # 59, Stip. # 71).  Accordingly, dollars must be
allocated to the highest national priorities that are eligible
and justified.  (Dkt. # 59, Stip. # 71).

The Authority received approximately $24 million dollars
from the FAA in 2008 for its runway safety area project and it
has received approximately $40 million from the FAA in the past
twenty years.  (Dkt. # 59, Stip. # 73).  The defendant
emphasizes that the current circumstances are not equivalent to
those that existed in 2008, when the Authority received funding
for a project concerned with safety and where there was a
current enforcement action by the FAA pending against the
Airport.  (Dkt. # 74 at 23).

The defendant also notes that just because the FAA has
approved an ALP or Master Plan for an airport, as it has in this
case, it does not follow that the agency must provide funding to

that airport to make that plan a reality.  (Dkt. # 74 at 23).
The defendant states that "the FAA's discretion to fund airport
improvements remains subject to a ranking in which safety
concerns have the highest priority."  (Dkt. # 74 at 23; trial
transcript at 134-35).

The Court is persuaded by the defendant's arguments.  In light
of the fact that the Airport would have to remedy its violation
of several federal grant assurances and obtain DEEP approval
before proceeding with any runway expansion project, there does
not appear to be a direct causal relationship between the
statute and the plaintiff's alleged injury.

Additionally, even if the Authority were to overcome these
obstacles, it is uncertain that the FAA would provide the
necessary funding for plaintiff to complete the proposed runway
project. For these reasons, the Court finds plaintiff's argument
that it is injured by the mere existence of the statute to be
unpersuasive.

Plaintiff next argues that the statute has directly led to
inadequate revenue at the airport and chronically low service
levels, and that the evidence presented at trial proves this.
(Dkt. # 73 at 8).  Plaintiff contends that the dire financial
situation of the airport is tied to the chronically low services
levels and that the low service levels are "inextricably tied to
the current length of Runway 2/20."  (Dkt. # 73 at 8).

Plaintiff claims that these injuries can be redressed by invalidating Conn. Gen. Stat. §15-120j(c).  (Dkt. # 73 at 8).

Plaintiff states that over the last eight years the Authority has been operating at a loss which has required annual subsidies from the state and the City of New Haven. (Dkt. # 73 at 10; Exhibit B).  Since 2009, the Airport has experienced an average annual operating loss of $1,800,000.  (Dkt. # 73 at 10; Dkt. # 59, Stip. # 58; Exhibit B).  According to the testimony of Mr. DeCoster, "the lengthening of the runway is the absolute door opener in order to have a chance at improving the financial condition of the airport."  (Trial transcript at 99).

Mr. DeCoster also testified that if additional service were brought to Tweed, "[i]t would absolutely increase direct and indirect revenue and make a major impact on the deficit that occurs today."  (Trial transcript at 100).  According to plaintiff, "[a] longer runway would permit Tweed to accommodate new commercial service which would result in additional revenue for the Airport, alleviate its annual operating losses and significantly reduce state and local subsidies."  (Dkt. # 73 at 12).

The defendant argues that the evidence fails to show that the state statute has caused plaintiff the loss of current business, and therefore plaintiff fails to show that it has suffered an injury.  (Dkt. # 74 at 14).  The defendant notes

that "[w]hile evidence presented at trial shows that the runway was 5,600 linear feet prior to the passage of Conn. Gen. Stat. §15-120j(c) in 2009, no evidence has been presented suggesting that service levels at the Airport have become chronically low or lower since then."  (Dkt. # 74 at 14).  Defendant also notes that plaintiff's witnesses failed to account for the service levels at the Airport prior to 2009 or indicate whether there has been or currently is a market demand for any new type of commercial service to or from the airport.  (Dkt. # 74 at 141; trial transcript at 129).

The Court finds that plaintiff's failure to account for the financial status of the airport prior to the passage of the state statute in 2009 constitutes a significant problem. Plaintiff must prove that the downturn in the Airport's financial situation is a direct result of the passage of Conn. Gen. Stat. §15-120j(c) in order to show a causal relationship between the statute and the alleged injury.

Plaintiff next argues that Tweed is unable to attract new commercial services to the Airport as a result of Conn. Gen. Stat. §15-120j(c).  (Dkt. # 73 at 12).  Plaintiff claims that the evidence adduced at trial shows that the length of Runway 2/20 has already deterred at least one commercial carrier from bringing service to Tweed, and that the Airport will be unable

to attract new commercial service if Runway 2/20 is not
lengthened.

The parties stipulated to the fact that despite marketing
efforts and various attempts to attract new service, the
Authority has failed to attract a single new scheduled
commercial carrier since 2009.  (Stip. # 18).  The parties also
stipulated that during the six years that Mr. Reich has been
providing marketing services to the Airport, he has been in
touch with approximately ten different airlines with regard to
the possibility of bringing service to the Airport.  (Stip. #
47).  Nonetheless, Mr. Reich has been unable to convince a
single airline to commence service at the Airport.  (Stip. #
57).

Plaintiff argues that there is a direct link between the
Authority's inability to attract new commercial service and the
length of Runway 2/20.  (Dkt. # 73 at 14).  Plaintiff notes that
in Mr. Reich's experience, "the overriding issue with respect to
an airline choosing to provide service to a new destination is
economic viability."  (Dkt. # 73 at 14).  Plaintiff claims that
runway length is an integral part of an airline's economic
viability analysis, and that Tweed is effectively handicapped by
its inability to lengthen the runway because it prevents the
Airport from even getting a place at the table to negotiate with

commercial air carriers.  (*See* Dkt. # 73 at 14-15; Dkt. # 59, Stip. # 51; Reich Affid. at ¶11).

Nonetheless, plaintiff notes that it has received "real and substantial interest from Allegiant Air, LLC in terms of bringing commercial service to the airport."  (Dkt. # 73 at 15; *see* Exhibit 10). Mr. DeCoster testified that Allegiant Air is one of the fastest growing, ultra-low cost fares in the industry. (Trial transcript at 57). Plaintiff alleges Allegiant cannot proceed with its analysis of Tweed as a potential market specifically because Runway 2/20 is too short for Allegiant to comfortably operate regularly scheduled commercial service with its current fleet of planes.[2]  (Dkt. # 73 at 15-16).

The defendant argues that "the evidence does not support the plaintiff's contention that it has incurred specific lost business opportunities due to the runway limitation in Conn. Gen. Stat. § 15-120j(c)."  (Dkt. # 74 at 11).  The defendant argues that Plaintiff's Exhibit 10 does not prove a lost business opportunity.  Exhibit 10 is a letter from Allegiant to the FAA, in which Allegiant indicated its willingness to reopen its analysis of whether it would be economically viable to bring

---

[2] Mr. DeCoster gave his opinion on whether Allegiant Air might be willing to bring service to Tweed if the runway is lengthened (trial transcript at 94-95), it would have been helpful had Tweed called a representative from Allegiant to testify on this subject. As Exhibit 10 indicates, Allegiant has not yet gone forward with its analysis of Tweed as a potential market. There is nothing in the record which establishes what factors Allegiant would want to analyze or how Tweed would likely fare with respect to each such factor.

regularly scheduled commercial service to Tweed if the runway were lengthened.  The defendant notes that the "Allegiant letter itself contains too many contingencies to show a specific lost business opportunity for the plaintiff based on the length of the runway."  (Dkt. # 74 at 12; *see* Exhibit 10).  The defendant also argues that "there is a complete dearth of evidence showing that any airline has even considered whether regularly scheduled commercial service to the Airport could or would be economically feasible with a lengthened runway."  (Dkt. # 74 at 15; trial transcript at 73, 128-30). The Court agrees.

Citing In re Old Carco LLC, 470 B.R. 688, 692 (S.D.N.Y. 2012) (hereinafter "In re Old Carco"), the plaintiff argues that it has standing to seek prospective declaratory relief before exposing itself to actual injury.  (Dkt. # 73 at 17-19).  Plaintiff also argues that it does not have to show an actual commitment from an air carrier in order to establish standing.  (See Dkt. # 73 at 17-19).  In *In re Old Carco*, a Chapter 11 debtor and a new entity that assumed liabilities of debtors and their debtor-affiliates brought an action for declaratory and injunctive relief against Colorado and Kentucky state officials responsible for enforcing state automobile dealer laws.  In re Old Carco, 470 B.R. at 688.  The plaintiffs alleged that certain state statutes violated and were preempted by the Supremacy Clause.  Id.  The state argued that the plaintiffs lacked

standing because they had not yet suffered an injury.  Id. at 697.

In finding that the plaintiffs established standing, the Court noted that "[e]nforcement of the Kentucky statute would cause New Chrysler to sustain an injury that could be redressed by this decision."  In re Old Carco LLC, 470 B.R. at 697.  The Court quoted MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007), in which that Court held that "the Declaratory Judgment Act permits a plaintiff to seek prospective declaratory relief rather than face exposure to liability or injury before seeking remedial relief."  Id.

The Court finds that this case is distinguishable from *In re Old Carco*.  In *In re Old Carco*, the Court was able to precisely identify the likely injury.  More specifically, the Court stated that "New Chrysler will either have to forego selling its products within ten miles of a rejected dealer for ten years or will have to contract with the dealers whose previous contracts were rejected during the bankruptcy proceeding."  *In re Old Carco*, 470 B.R. at 697.  In this case, plaintiff argues that the statute is preventing the Airport from attracting new commercial service, but there is no evidence in the record that any airline, including Allegiant, has indicated that it would commit to bringing service to Tweed if the runway

is lengthened.  (Dkt. # 59 at 14; trial transcript at 73, 77, 128-30).

In *In re Old Carco*, there was also a direct causal relationship between the injury and the state statute, and the court explicitly found that the injury could be redressed by invalidating the statute.  Id. at 697. ("Enforcement of the Kentucky statute would cause New Chrysler to sustain an injury that could be redressed by this decision).  In this case, plaintiff has failed to show a direct causal relationship between the length of the runway and the Airport's inability to attract new commercial service.[3]  (See trial transcript at 128). Likewise, without a clear commitment from any air carrier that it will bring service to the Airport if the runway is lengthened, it is not clear that plaintiff's alleged injury would be redressed in the absence of Conn. Gen. Stat. § 15-120j(c).  (See Exhibit 10).  For these reasons, the Court finds that *In Re Old Carco* is distinguishable from the current case.

The Court finds the defendant's arguments to be persuasive. The parties stipulated that notwithstanding marketing efforts, the Authority has not received a commitment from any airline to provide service at the Airport if the statutory restriction on

---

[3] Mr. DeCoster testified that he had not conducted any independent market demand studies that analyzed other potential destinations for commercial service from Tweed, or that analyzed Tweed as a potential destination from other airports.  (Trial transcript at 128).

the length of Runway 2/20 is removed.  (Dkt. # 59 at 14).  The
Court finds that without an express commitment that a carrier
will bring service to the airport if the runway length is
increased, the plaintiff cannot show a causal connection between
the statute and the alleged injury.

Plaintiff next argues that the airport cannot comply with
federal grant requirements due to the state statute's
restriction on the length of Runway 2/20.  (Dkt. # 73 at 19).
Plaintiff notes that whenever Tweed accepts federal funds, it
agrees to various grant assurances which, among other things,
require compliance with a long list of federal statutes and
regulations directed to airport facilities and operations.
(Dkt. # 73 at 20).  Non-compliance by an airport such as Tweed
can result in an enforcement action by the FAA.  (Dkt. # 73 at
20, *See* Dkt. # 59, Stip. # 36).  The defendant argues that "the
Authority, not the state, has been the party responsible for the
Authority's failure to comply with federal grant assurances and
related federal statutes since the enactment of Conn. Gen. Stat.
§15-120j(c) in 2009."  (Dkt. # 74 at 16).

Plaintiff notes that the "FAA has identified several
federal obligations and grant assurances that Tweed is unable to
comply with as a result of General Statutes § 15-120j(c)."
(Dkt. # 73 at 20).  In fact, the FAA has not commented directly
on Conn. Gen. Stat. § 15-120j(c), but it has commented on a

Memorandum of Agreement ("MOA") that was established among the City of New Haven, the Town of East Haven, the Authority and certain members of the Connecticut General Assembly.  (Dkt. # 59, Stip. # 60).

The FAA noted its concern regarding the runway length limitation in the MOA[4], but it also noted its concern regarding potential violations of the Airport Noise and Capacity Act of 1990 ("ANCA") and the Anti-Head Tax Act.  (Def. Ex. A).  The defendant emphasizes that this agreement was entered into voluntarily by the Authority and that no evidence was presented at trial that the Authority has taken any actions to address any of the FAA's concerns regarding federal grant assurances or violations of the ANCA or the Anti-Head Tax Act.  (Dkt. # 74 at 20).

The FAA has also expressed concern with the taxiways at the Airport.  The parties stipulated in their joint trial memorandum that the current locations and dimensions of the taxiways are not in compliance with federal regulations in terms of their distance to Runway 2/20.  (Dkt. # 59, Stip. # 39).  The FAA has given the Authority until May 6, 2021 to redesign and reconstruct its taxiways, including realignment of Taxiway A, to bring the Airport into compliance with federal design standards.

---

[4] The MOA limits Runway 2/20 to the existing paved runway length of 5,600 linear feet.  (Dkt. # 59, Stip. # 61).

(Dkt. # 59, Stip. # 43).  Plaintiff suggests that the taxiways might be altered as a part of the proposed runway extension project so that they are in compliance with federal law.  (Dkt. # 59, Stip. # 39).  But the Authority had proposed a nonstandard parallel taxiway as part of its operation safety improvements. (Dkt. # 74 at 17; See also trial transcript at 31).

The defendant argues that it is "disingenuous for the plaintiff to claim that the runway limitation statute has prevented it from complying with federal grant assurances . . . when the plaintiff itself has proposed a nonstandard taxiway in contradiction of the FAA's requirement to create standard taxiways in 2012.  (Dkt. # 74 at 18).

The Court finds that the plaintiff has failed to provide evidence of a causal relationship between Conn. Gen. Stat. §15-120j(c) and the Authority's alleged inability to comply with federal grant requirements.  The evidence suggests, instead, that the Authority's failure to comply with federal grant requirements is for the most part self-imposed.

Finally, plaintiff argues that the only commercial aircraft currently servicing the Airport will soon be retired, leaving Tweed with no commercial service.  (Dkt. # 73 at 22).  Plaintiff cites to a report prepared by John DeCoster, an expert witness

who testified on behalf of the plaintiff.[5]  (Pl. Ex. # 13).   Mr

DeCoster indicates in his report that the Dash-8 is "nearing the

end of its useful life" at which point "a major overhaul of the

airport is required."  (Pl. Ex. # 13 at 3).   However, he opined

that since the "economics for such an overhaul [are] no longer

supportable," the aircraft will be retired from service.  (Pl.

Ex. # 13 at 3).

    According to Mr. DeCoster's report, the "logical aircraft

that will replace the Dash 8 is the 50 seat regional jet, either

the Bombardier CJ200 or the Embraer 145."  (Pl. Ex. # 13 at 3).

However, according to Mr. DeCoster, these aircraft are also

reaching their "cycle limits" and are being phased out.  (Pl.

Ex. 13).   According to Mr. DeCoster's report, American, Delta

and United have all indicated that once their 50 seat jets

"reach their maximum cycles or if fuel increases significantly,

the aircraft will be retired because the flights will no longer

be profitable."  (Pl. Ex. # 13 at 3).

    Mr. DeCoster also noted that the desired minimum runway

length for the 50 seat regional jets is 6,200 linear feet in

order to avoid payload hits (according to the manufacturer's

specifications, 5,600 linear feet is the lowest allowable

---

[5] The defendant objected to Mr. DeCoster's testimony, arguing it was based on
insufficient and unreliable evidence. (Trial transcript at 76-77).  In the
interest of caution and because this was a bench trial, the Court overruled
the objection and allowed the testimony.

condition).  (Pl. Ex. # 13 at 3).  According to Mr. DeCoster, once the 50 seat regional jet is no longer available, the next size aircraft is the 70/76 regional jet, which likely requires a minimum runway length of 6,220 to 6,600 linear feet.  (Pl. Ex. # 13 at 4).  Thus, plaintiff argues that "there is a real and distinct possibility that the Dash 8, Bombardier CJ200 and Embraer 145 will be retired at or around the same time, leaving Tweed with absolutely no commercial service."  (Dkt. # 73 at 23).

The defendant argues in response that the plaintiff has failed to show that the Dash 8 will be phased out in the near future, that a replacement plane will need a longer runway, or that regularly schedule commercial service at the airport is jeopardized and may be terminated.  (Dkt. # 74 at 7).  The defendant notes that on cross examination, Mr. DeCoster testified that he does not know when the American Airlines Dash 8 will be retired.[6]  (Dkt. # 74 at 8, *See* trial transcript at 119).  The defendant further notes that "Mr. DeCoster agreed at trial that he 'cannot conclude that regularly scheduled commercial service is jeopardized at the moment.'"  (Dkt. # 74 at 9; trial transcript at 119-20).

---

[6] On cross examination, Mr. DeCoster also testified that American Airlines could service Tweed with either the Bombardier CJ 200 or the Embraer 145 after the Dash 8 is retired and nothing in his report indicates that the use of those two jets would not be profitable for American Airlines.  (Trial transcript at 112-14; 122-23).

The defendant argues that "the plaintiff's claim of a 'possible future injury' arising from an unknown phase out date of both the Dash 8 and the two regional replacement jets does not satisfy Article III requirements necessary to establish injury in fact since such future possible events are not 'threatened injur[ies]' that are 'certainly impending.'"  (Dkt. # 74 at 10).  Relying upon the Second Circuit's ruling in Shain v. Ellison, 356 F.3d 211, 216 (2d Cir. 2004), the defendant argues that plaintiff's argument is based upon "an accumulation of inferences" and is "too speculative and conjectural."

As a result, the defendant urges the Court to reject the "plaintiff's hypothetical scenario that if the only type of aircraft currently providing service to the Airport will soon be phased out, and if there are no replacement planes that can operate on the existing runway, and if new planes will need a longer runway, and if that development jeopardizes commercial service at the Airport, the consequence will be that enforcement of Conn. Gen. Stat. § 15-120j(c) may terminate all commercial service 'someday' in the future."  (Dkt. # 74 at 11).

While the Court is quite sympathetic to plaintiff's potential situation, the Court is not persuaded that Tweed faces an imminent threat that the only commercial aircraft currently servicing the airport will be retired, thereby leaving Tweed with no commercial service.  Plaintiff's witness, Mr. DeCoster,

testified on cross-examination that American Airlines has been servicing Tweed since 2009 with no interruptions, and that American Airlines finds this service to be profitable.  (Trial transcript, p. 105, lines 18-23; p. 107, lines 10-14).  Mr. DeCoster also testified that he does not know when the Dash 8 would be retired.  (Trial transcript at 118-19). On cross examination, Mr. DeCoster testified that in publications that he has "read from airlines, they are speculating, …, that by the end of the decade, they will have reached their cycle lives."[7]

Thus, plaintiff has failed to offer a definitive end date, or even a definite time frame, for the useful life of the Dash 8.[8] (*See* Dkt. # 73 at 23; trial transcript at 69-70). (Trial transcript at 114).  Plaintiff also cannot identify a definitive end date for the useful life of the likely replacement jets.[9] (*See* Dkt. # 73 at 23; trial transcript at 69-70, 117-19).

---

[7] Mr. DeCoster's report did not contain or attach any written information from American Airlines or any other airlines discussing when the Dash 8 will be retired. (Trial transcript at 68). Additionally, Mr. DeCoster has not conducted any independent analysis on the subject. (Trial transcript 69).

[8] During the trial, defense counsel asked Mr. DeCoster, "[s]o isn't it true that the facts that you have to offer this court on the Dash 8 phaseout are that someday in the future the Dash 8 will be phased out but you don't know when, correct?"  Mr. DeCoster replied, "Correct."  Defense counsel then asked about the two logical replacement jets, "[a]nd isn't it true that your report does not identify exactly when [the Bombardier CJ200 and the Embraer 145] will reach the end of their useful lives?"  Mr. DeCoster replied, "Yes." (Trial transcript at 69).

[9] Mr. DeCoster's report did not contain any written information from any of the airlines indicating when the two replacement jets will be retired from service and Mr. DeCoster did not conduct any independent analysis on that subject. (Trial transcript at 69-70).

Plaintiff's argument that "there is a real and distinct possibility that the Dash 8, Bombardier CJ200 and Embraer 145 will be retired at or around the same time," falls short without actual evidence.  "Abstract injury is not enough . . . [i]t must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct."  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

For these reasons, the Court finds that the Authority has failed to prove that it faces an imminent threat of losing all commercial service.

## II.  Preemption

Plaintiff argues that Conn. Gen. Stat. §15-120j(c) violates the Supremacy Clause of the United States Constitution.  (Dkt. # 75 at 10).  Specifically, plaintiff argues that the statute is preempted by three federal statutes: the Federal Aviation Act ("FAAct"), the Airline Deregulation Act ("ADA"), and the Airport and Airways Improvement Act ("AAIA").  (Dkt. # 73 at 25).  The defendant argues, in response, that the runway limitation in Conn. Gen. Stat. §15-120j(c) does not violate the FAAct, the ADA or the AAIA.  (Dkt. # 74 at 24).

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art. VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law."

Hillsborough Cty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (citations omitted).  "Preemption can be either express or implied."  Air Transp. Ass'n of Am., Inc. v. Cuomo, 520 F.3d 218, 220 (2d Cir. 2008).

"In general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, 'where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law'; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 104 (2d Cir. 2010).  "The key to the preemption inquiry is the intent of Congress."  Id.

### A.   The FAAct

Plaintiff does not argue in its post-trial brief that Conn. Gen. Stat. §15-120j(c) is directly preempted by the FAA, and there is no evidence in the record to support direct preemption. Plaintiff instead argues that Conn. Gen. Stat. §15-120j(c) is impliedly preempted by the FAAct under a theory of field preemption.  (Dkt. # 73 at 26).  Plaintiff contends that the "evidence at trial establishes that runway length is indeed a component part of the field of airline safety," and is therefore

part of a field that is completely occupied by the federal government.  (Dkt. # 73 at 26).

The defendant argues that the plaintiff's "claim that Conn. Gen. Stat. §15-120j(c) attempts to regulate a field occupied by the federal government, aviation safety and service capacity is misplaced," and that "[n]o evidence has been presented showing that the runway limitation statute interferes with the Authority's ability to comply with federal aviation safety standards."   (Dkt. # 74 at 26).  The defendant also attempts to distinguish the current case from Tweed-New Haven Airport Auth. v. Town of East Haven, Conn., 582 F. Supp. 2d 261 (D. Conn. 2008)(Hall, J.)(hereinafter "*Tweed v. Town of East Haven*"), a case that is integral to plaintiff's argument.

In *Tweed v. Town of East Haven*, the plaintiff brought an action against the Town of East Haven, seeking a declaratory judgment that the Town's regulations, which interfered with the Airport's "runway project," were preempted by federal law.  The purpose of the runway project was to put Tweed-New Haven Airport in compliance with the FAA's current runway safety area ("RSA") requirements.  Id. at 270.

The district court found that "Congress intended to occupy and regulate the field of airline safety," and that this power extends to "grounded planes and airport runways."  Id. at 268. The court ruled that "because the TSAs are being created for the

purpose of meeting the FAA safety standards and the Runway Project is being done within Authority property, the court finds that the East Haven defendants' regulations, as applied to the Runway project, are preempted by the FAAct."   Id.

The Court agrees defendant's argument that Conn. Gen. Stat. §15-120j(c) does not interfere with plaintiff's ability to comply with federal aviation safety standards.  The Court also finds that the current case is distinguishable from *Tweed v. Town of East Haven*.

The "runway project" in *Tweed v. Town of East Haven* was undertaken in response to an FAA enforcement action for the purpose of complying with FAA safety standards.  In the current case, there is no pending FAA enforcement action.  (Dkt. 59, Stip. # 42).  While the airport is not in compliance with FAA standards due to non-standard taxi-way geometry, there is no evidence that extending the runway is necessary to fix this problem or for the Authority to come into compliance with FAA safety guidelines.   (Dkt. # 59, Stip. ¶43).

Thus, plaintiff's argument that the "non-standard separation between the taxi-way and the runway could be brought into compliance as part of the proposed runway extension project," is unavailing.  (Dkt. 59, Stip. # 39).  Plaintiff has failed to present evidence that the runway length in this instance is a component part of the field of airline safety.

Plaintiff also argues that Conn. Gen. Stat. §15-120j(c) is preempted by the FAAct under a theory of conflict preemption. (Dkt. # 73 at 27).  Plaintiff argues that "conflict preemption does not just hinge entirely on whether the state law makes it impossible to comply with the federal law," but it also arises when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. (Dkt. # 73 at 27, *citing* Hillsborough County, 471 U.S. at 713; *see also* California v. ARC Am. Corp., 490 U.S. 93, 100-01 (1989).

Plaintiff contends that Runway 2/20 "remains too short for almost all commercial aircraft to operate regularly scheduled service in a safe and commercially reasonable manner."  (Dkt. # 73 at 27).  Plaintiff also argues that Conn. Gen. Stat. §15-120j(c) prevents it from complying with federal grant requirements.  (Dkt. # 73 at 27).  In response, the defendant argues that there is no evidence showing that the statute has directly or indirectly caused the plaintiff to fail to comply with any federal safety regulations.  (Dkt. # 74 at 25).

As noted above, "[c]onflict preemption arises when "local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives."  New York SMSA Ltd. P'ship, 612 at 104.  There is no pending enforcement action by the FAA

against the Authority.  (Dkt. # 59, Stip. ¶ 42).  The current
locations and dimensions of the taxiways are not in compliance
with regulations in terms of their distance from Runway 2/20,
but this problem can be fixed without extending the length of
Runway 2/20.  (Dkt. 59, Stip. # 39).  Thus, there is no evidence
in the record showing that it is impossible for the Authority to
comply with both Conn. Gen. Stat. §15-120j(c) and the FAAct.

     There is also no evidence in the record that Conn. Gen.
Stat. §15-120j(c) stands as an obstacle to the achievement of
federal objectives.  Plaintiff argues that the runway "remains
too short for almost all commercial aircraft to operate
regularly scheduled service in a safe and commercially
reasonable manner." (Dkt. # 73 at 27).  However, the airport is
currently served by American Airlines with a Dash 8 turboprop
aircraft that seats between 37 and 40 passengers.  (Pl. Ex. 13).
According to a letter written by Mr. DeCoster, who testified on
behalf of the plaintiff, "[t]he current runway length is
sufficient to accommodate that aircraft in most weather
conditions without a payload hit."  (Pl. Ex. 13).  American's
continued service shows that it is possible to operate regularly
scheduled service in a safe and commercially reasonable manner.
(Trial transcript at 105-7, 122-23).

     For the aforementioned reasons, the Court finds that Conn.
Gen. Stat. §15-120j(c) is not preempted by the FAAct.

**B.    The ADA**

The Airline Deregulation Act "ADA" was enacted in 1978 based on Congress's determination that "'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality ... of air transportation services.'"  Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S. Ct. 2031, 2033, 119 L. Ed. 2d 157 (1992).  The ADA includes an express preemption provision that prohibits states from enforcing any law "'relating to rates, routes, or services' of any air carrier." Morales, 504 U.S. at 378-79.  Under the ADA, "'air carrier' means a citizen of the United States undertaking by any means, directly or indirectly, to provide air transportation."  49 U.S.C.A. § 40102(2) (West).  Airport is defined separately as "a landing area used regularly by aircraft for receiving or discharging passengers or cargo.  49 U.S.C.A. § 40102(9) (West).

Plaintiff argues that Conn. Gen. Stat. §15-120j(c) is expressly preempted by the ADA because the "restriction on the Length of Runway 2/20 is related to 'a price, route or service of an air carrier.'"  (Dkt. # 73 at 28).  The defendant argues that the ADA does not apply because the express preemption clause in the ADA specifically applies to an "air carrier" as

opposed to an airport.  (Dkt. # 74 at 34).[10]  Plaintiff contends that a state law does not have to specifically target an air carrier in order to be preempted by the ADA, as long as it is related to the price, route or service of an air carrier.  (Dkt. # 73 at 28).

Based upon the plain language of the ADA, the Court finds that the express preemption provision at issue applies specifically to air carriers, as opposed to airports, which are defined separately in the statute.  The Court further finds that the Authority lacks standing to bring this claim on behalf of a third party.  "[A] party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" Kowalski v. Tesmer, 543 U.S. 125, 129, (2004).  Therefore, plaintiff cannot assert legal rights on behalf of Allegiant, or any other hypothetical air carrier who might bring service to the Airport.

Even if the preemption provision applied in this case, plaintiff still has not shown that Conn. Gen. Stat. §15-120j(c) relates to rates, routes or services.  "State enforcement

---

[10] "It is worth emphasizing that it is the effect on the 'price, route or service' of an air *carrier* — not an airport—that is prohibited by the ADA." Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n, 681 F. Supp. 2d 182, 207 (D. Conn. 2010)(Kravitz, J.), aff'd, 634 F.3d 206 (2d Cir. 2011).

actions having a connection with or reference to airline 'rates, routes, or services' are pre-empted" under the ADA.  <u>Morales v. Trans World Airlines, Inc.</u>, 504 U.S. 374, 384, 112 S. Ct. 2031, 2037, 119 L. Ed. 2d 157 (1992).  However, the Court is hard pressed to find any clear connection between Conn. Gen. Stat. §15-120j(c) and air carrier rates, routes or services.

Plaintiff argues that the statute relates to the route and service of an air carrier because it is preventing Allegiant from bringing service to the Airport and it is preventing the Authority from attracting new service.  (Dkt. # 73 at 30).  This argument is not supported by the evidentiary record.  Allegiant has not committed to bringing service to the Airport, even if the runway is extended.  (*See* P. Ex. # 10, "Allegiant letter").  And, American Airlines continues to operate the same service that it operated prior to the passage of Conn. Gen. Stat. §15-120j(c).  (Trial transcript at 119).  There is no evidence in the record to suggest that American Airlines would expand its service if the runway were extended.  Furthermore, the Court cannot find preemption based upon hypothetical future carriers who might want to bring service to Tweed at some undisclosed future date.

For these reasons, the Court finds that the express preemption provision in the ADA does not apply in this case, and

even if it did apply, the Court finds that Conn. Gen. Stat. §15-120j(c) is not preempted by the ADA.

### C.    The AAIA

The Airport and Airway Improvement Act ("AAIA") "serves the purpose of providing federal funding to airport construction projects to promote a wide variety of policy goals." City of Cleveland, Ohio v. City of Brook Park, Ohio, 893 F. Supp. 742, 749 (N.D. Ohio 1995). "The Act imposes no requirements, nor does it authorize the promulgation of any regulations, that govern airports generally or that govern projects for which no federal funding is being sought." Id. at 752.

Plaintiff argues that Conn. Gen. Stat. §15-120j(c) is impliedly preempted by the AAIA under theories of field and conflict preemption. Plaintiff notes that the "comprehensive statutory scheme of the AAIA demonstrates the supremacy of federal interest in commercial air service expansion, particularly with regard to development of airport facilities. (Dkt. # 73 at 31). Plaintiff states that "the AAIA, in conjunction with the FAAct and ADA, demonstrates the dominance of the federal interest in aviation safety and airport improvement projects and requires the FAA to develop and maintain a national plan of integrated airport systems." (Dkt. # 73 at 31).

Plaintiff also argues that Conn. Gen. Stat. §15-120j(c) directly conflicts with the AAIA because it serves as an impediment to the federal government's and Tweed's objective of expanding service, to the implementation of the Master Plan adopted by the FAA that contemplates the expansion of Runway 2/20 and to increasing compliance with federal safety standards. (Dkt. # 73 at 31).

The defendant argues that the AAIA does not fully occupy the field of aviation safety and service capacity.  (Dkt. # 74 at 38).  Instead, "the AAIA provides a mechanism through which the FAA is to determine whether to provide federal funding to airport development and improvement projects."  (Dkt. # 74, *quoting* City of Cleveland, 893 F.Supp. at 752).  The defendant also argues that there is no actual conflict between Conn. Gen. Stat. §15-120j(c) and the AAIA.  This is because "the AAIA does not set regulatory requirements for the construction of airport runways; it only sets requirements for those wishing to secure federal funding for that type of project."  (Dkt. # 74 at 36).

The Court does not find that Conn. Gen. Stat. §15-120j(c) is preempted by the AAIA under a theory of field preemption. Plaintiff does not offer any case law in support of its legal conclusion that the AAIA occupies the field of aviation safety and airport improvement projects.  Unlike the FAAct, which "was enacted to create a 'uniform and exclusive system of federal

46

regulation' in the field of air safety," the AAIA does not impose any requirements or authorize the promulgation of federal regulations, unless funding is being sought.  *See* Air Transp. Ass'n of Am., Inc., 520 F.3d at 224.

Regarding the issue of conflict preemption, the Court again finds that the AAIA does not impose affirmative obligations unless an Airport is seeking federal funding.  Plaintiff is not obligated to seek federal funding.  Thus, plaintiff has not demonstrated that it is impossible to adhere with Conn. Gen. Stat. §15-120j(c) and the AAIA.

For the reasons set forth above, the undersigned finds that Conn. Gen. Stat. §15-120j(c) is not preempted by the AAIA.

**CONCLUSION**

For the reasons set forth herein, defendant's declaratory judgment action is DENIED.

This is not a recommended ruling.  The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  Appeals can be made directly to the appropriate United States court of appeals from this judgment. See 28 U.S.C. § 636(c)(3).

SO ORDERED at Hartford, Connecticut, this 30th day of September, 2017.

_____/s/_____
Robert A. Richardson
United States Magistrate Judge